```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

FPP, LLC,

                Plaintiff,

       -v-                                              No.  14 CV 6172-LTS-AJP

XAXIS US, LLC,

                Defendant.

-------------------------------------------------------x
```

## MEMORANDUM OPINION AND ORDER

Plaintiff FPP, LLC ("FPP"), a company that was formerly known as Panther Panache, LLC ("Panache"), brought this suit principally asserting claims for breach of contract against Defendant Xaxis US, LLC ("Xaxis"), a company that was formerly known as 24/7 Real Media US, Inc. ("24/7"). This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1332. Before the Court are cross-motions for summary judgment by both parties. The Court has carefully considered the submissions of the parties and, for the reasons that follow, both motions are denied.

## BACKGROUND

The following factual recitation is drawn from the parties' Local Civil Rule 56.1 Statements, and is undisputed except where noted.[1]

Plaintiff FPP, which was previously known as Panache, began operations in 2006

---

[1] See Plaintiff FPP's Rule 56.1 Statement (docket entry no. 127) ("FPP 56.1 Stmt."); Defendant Xaxis' Rule 56.1 Statement (docket entry no. 118) ("Xaxis 56.1 Stmt."). Citations to the parties' Rule 56.1 Statements incorporate by reference the evidence identified therein.

as a rich media company offering software and other services for website owners and operators (known in the industry as "publishers") to use in connection with the sale of digital advertisements on the publishers' websites.  (FPP 56.1 Stmt. ¶¶ 1-2.)  Defendant Xaxis, which was previously known as 24/7, was also in the digital advertising business.  (Xaxis 56.1 Stmt. ¶¶ 9-10.)

    The digital advertising business includes both advertisers (known as the "demand side" of the industry) and publishers (which supply space for advertising on their websites).  (FPP 56.1 Stmt. ¶¶ 2-4.)  When a publisher displays a particular advertisement, each such display is referred to as an impression, and the total number of times a publisher displays that advertisement is referred to as the impressions for the ad.  (Xaxis 56.1 Stmt. ¶ 13.)  Because of the volume of traffic on most webpages, advertisers are charged for ad placement based on the cost per thousand impressions (referred to as "CPM").[2]  (FPP 56.1 Stmt. ¶ 10.)

    Plaintiff FPP developed software that allowed publishers to test interactive digital advertisements (referred to as "rich media") before those ads went live on the publishers' webpages, in order to ensure that the rich media functioned properly before it was approved to run.  (FPP 56.1 Stmt. ¶¶ 18-20.)  FPP also developed technology relating to video advertisements.  (Id. ¶ 28.)

    Defendant Xaxis had a "media side" that operated a so-called "ad network," a collection of publishers' websites that sold advertising space as a group, pooling their audiences in order to increase demand from advertisers.  (Xaxis 56.1 Stmt. ¶ 21.)  Xaxis' ad network was called the Global Web Alliance ("GWA").  (Id.)  Advertisers would pay Xaxis (on a CPM basis) to participate in the GWA, and Xaxis would then remit between 60-70% of the advertisers' gross

---

[2]   The abbreviation "CPM" stands for "cost per mille" (Latin for thousand).

payment to the website publishers.  (Id. ¶¶ 24-25.)  Xaxis' media side did not, however, receive any revenue directly from the publishers whose websites comprised the GWA.  (Id. ¶ 26.)

Separately, Xaxis developed and licensed a technology called Open AdStream ("OAS") to publishers, which allowed publishers to serve their own ads.  Publishers using OAS would pay Xaxis a licensing fee (also known as an "ad serving fee") on a CPM basis of between $0.05 and $0.10.  (Xaxis 56.1 Stmt. ¶¶ 18-20.)

Xaxis also used the OAS technology internally, to serve ads on the GWA.  (Xaxis 56.1 Stmt. ¶ 27.)  The internal Xaxis team that ran the GWA (the media side) would pay a fee (the "Internal Cross Charge") to the OAS team (referred to as the technology side) for use of the OAS technology.  (Id. ¶¶ 27-29.)  Historically, the Internal Cross Charge was set at $0.01 (on a CPM basis).  (Id. ¶¶ 32.)

In 2011, Xaxis's ad network generated approximately $85 million in revenue, $1.8 million of which came from video ads.  (Xaxis 56.1 Stmt. ¶¶ 35-36.)  Recognizing that the market for video ads was increasing, Xaxis began to explore the possibility of acquiring FPP.  (Id. ¶¶ 38-40.)  On August 18, 2011, the parties executed a Letter of Intent relating to the acquisition of FPP by Xaxis.  (Id. ¶ 50.)  In that Letter of Intent (Xaxis 56.1 Stmt., Ex. 20), Xaxis described a $5 million up-front purchase price, plus an "Earnout Payment" that would be "equal to 2x the 2013 net revenue of the Panache Division, including revenues attributable by mutual reasonable agreement to the products of the Panache Division."  (Ex. 20, at 4.)

In later negotiations over the acquisition, Xaxis sent a "projection sheet" to FPP.  (Xaxis 56.1 Stmt., Ex. 33.)  In this document, Xaxis provided a series of "assumptions" as to CPMs that would reflect "25% of the average CPM for video ad serving experienced with 3rd party agreements with customers of Publisher-Side Video Technology with similar volume of

impressions on an annual basis." (Ex. 33, at 5.) Those projections indicated that such a CPM was estimated to be "1.75¢" in 2012 and 2013. (Id.) This CPM was then used to calculate an amount of "illustrative revenue" that would be "attributable" to FPP after the acquisition. (Id. at 4.)

On November 30, 2011, the parties executed a final Asset Purchase Agreement (the "APA"). (Id. ¶ 79.) The APA provided that Xaxis would pay FPP $5 million as an up-front purchase price, and further provided for an "Earn-Out Payment" of up to $13 million to FPP if certain conditions were met. (Xaxis 56.1 Stmt. ¶ 80; see docket entry no. 1, Ex. A (APA).) The parties' dispute centers on one component of the calculation of that Earn-Out Payment, "Basic Video Media Fees."

Basic Video Media Fees are defined in Section 2.1.2(d) of the APA, as follows:

> Basic Video Media Fees, for the applicable period, shall mean the fees attributable to the Basic Video Media impressions displayed using the Publisher-Side Video Technology (determined on a CPM basis), which shall be the greater of (i) the applicable CPM derived using the same methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving as applied to video serving or (ii) twenty-five percent (25%) of the average CPM for video ad serving earned under third-party agreements for use of the Publisher-Side Video Technology with Publishers at comparable volumes of impressions to the Global Web Alliance on an annual basis.

Basic Video Media Fees, as defined above, are to be aggregated with several other categories of fees under Section 2.1.2(a) of the APA, in order to come up with a "Net Revenue" figure that is used to calculate the Earn-Out Payment.

The APA also contains an integration clause, stating that the text of the APA "contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein." (APA Section 10.9.)

At the end of the earn-out period, Xaxis undertook to calculate the Earn-Out Payment. According to Xaxis, it did so by first collecting the number of impressions derived from relevant campaigns (approximately 3.493 billion (FPP 56.1 Stmt. ¶ 89)) and then multiplying that number by a $0.01 CPM. (Xaxis 56.1 Stmt. ¶ 149.) Xaxis asserts that this $0.01 CPM was derived "by using the methodology used to derive the Internal Cross Charge to the GWA for display serving." (Id.) Xaxis has not identified that methodology in its submission in connection with the instant cross-motions. FPP asserts that the $0.01 CPM was "an approximation of how much it cost [Xaxis] to generate 1000 video impressions," a description Xaxis does not dispute. (FPP 56.1 Stmt. ¶ 94.) Under Xaxis' calculations, FPP is not entitled to any Earn-Out Payment, and Xaxis did not pay any Earn-Out Payment. (Id. at ¶ 114.) FPP disputes this calculation, and contends that it is entitled to the full $13 million Earn-Out Payment. (Id. at ¶ 116.)

The APA also required that Xaxis "not allocate employees" of FPP "to departments or projects that do not relate to the Panache Products" unless those other projects were "incidental or immaterial." (APA § 7.4(iv).) "Panache Products" was defined to include "Professional Services" as well as "the Publisher-Side Video Technology," which was itself defined to include FPP's software and "related features and capabilities that the 24/7 Group may, in its sole discretion, choose to build which are derived from the Panache Products." APA § 2.1.2(i) & (n).

After the transaction was completed, FPP asserts, Xaxis assigned legacy FPP employees to work on a new software product called Palette and precluded FPP employees from providing professional services to clients. (FPP 56.1 Stmt. ¶¶ 58-78.) FPP argues that Palette was not a "Panache Product" as defined by the APA. (FPP 56.1 Stmt. ¶ 61.) Xaxis disputes this

characterization, arguing that Palette was intended to be a Panache Product and use Panache ad formats. Xaxis submits that Palette was conceived by a Panache employee (Xaxis 56.1 Stmt. ¶ 126) and "would leverage underlying Panache technologies and Panache team expertise" (id. ¶ 129). FPP also alleges that Xaxis prevented FPP employees from servicing FPP's clients. (FPP 56.1 Stmt. ¶¶ 67-78.)

The parties have cross-moved for summary judgment. Plaintiff FPP has moved for summary judgment on its claim in Count One of the Amended Complaint that Xaxis breached the APA in calculating Basic Video Media Fees and owes FPP $13 million in damages for that breach of contract (in other words, FPP seeks a determination that it is entitled to the full $13 million Earn-Out Payment). FPP also moves for summary judgment as to liability on its claim (also part of FPP's breach of contract cause of action in Count One of the Amended Complaint) that Xaxis failed to maintain the Panache Business Unit as required by the APA. Xaxis moves for summary judgment dismissing all of FPP's breach of contract claims (Count One of the Amended Complaint), and dismissing Plaintiff's alternative claim for fraud (Count Two of the Amended Complaint).

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986) (internal quotation marks omitted)). In evaluating a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). If the moving party demonstrates a basis for summary judgment, the non-moving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. Anderson, 477 U.S. at 249 (internal quotation marks and citation omitted). If the evidence presented by the non-moving party "is merely colorable, or is not significantly probable," summary judgment may be granted. Id. at 250-51 (citations omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

"[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (citation and internal quotation marks omitted). "[I]f an agreement is 'complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-78 (2d Cir. 2004) (internal alterations omitted) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)). The determination of whether a written contract is ambiguous is a matter of law, as is the meaning of an unambiguous contract. Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 51 (2d Cir. 2011)). If a contract is ambiguous, "extrinsic evidence as to the parties' intent may properly be considered," and if such evidence is proffered, then "the meaning

of the ambiguous contract is a question of fact for the factfinder." JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

Plaintiff's Claim for Breach of Contract As to the Earn-Out Payment

The parties' dispute hinges on the construction of the definition of Basic Video Media Fees in Section 2.1.2(d) of the APA. That section initially requires calculation of the number of "Basic Video Media impressions displayed using the Publisher-Side Video Technology." (APA § 2.1.2(d).) FPP has proffered unrebutted evidence that this number is approximately 3.493 billion impressions. The APA then requires that the fees relating to these impressions be determined on a CPM basis by determining "the greater of (i) the applicable CPM derived using the same methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving as applied to video serving or (ii) twenty-five percent (25%) of the average CPM for video ad serving earned under third-party agreements for use of the Publisher-Side Video Technology with Publishers at comparable volumes of impressions to the Global Web Alliance on an annual basis." (APA § 2.1.2(d).)

Xaxis purportedly relied on the first computation method. Xaxis claims to have derived a $0.01 CPM by "using the methodology used to derive the Internal Cross Charge to the GWA for display serving." Xaxis admits, however, that the Internal Cross Charge was paid by Xaxis' media side to Xaxis' technology side – i.e., the Internal Cross Charge was never "charged to" the GWA, a network of third party publishers, but rather was charged to one internal division of Xaxis by another internal division. In light of the undisputed facts, Xaxis' use of the $0.01 CPM therefore does not find support in the plain language of the contract.

FPP's proposed construction of the contract does not appear to square with the

APA's plain language either. FPP also relies on the first method of calculating the applicable CPM in Section 2.1.2(d), and argues that the "methodology" in question should be understood to be that used by Xaxis to calculate the CPM it charged to advertisers who sought to place ads on the GWA. However, Section 2.1.2(d)(i) points to a methodology used to derive the CPM "charged to the Global Web Alliance" – i.e., to publishers – not a methodology used to derive the CPM charged to advertisers.

Read in light of the undisputed factual record before the Court, Section 2.1.2(d)(i) is ambiguous as a matter of law. FPP and Xaxis agree that Xaxis did not charge any direct, CPM-based fee to the GWA itself for serving display ads. Accordingly, the APA's reference to the "methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving" does not clearly identify an actual CPM calculation methodology that actually existed within Xaxis.

The parties have submitted considerable extrinsic evidence that is at least arguably relevant to the construction of the ambiguous language in Section 2.1.2(d). The existence of this extrinsic evidence, much of which is the subject of considerable dispute between the parties as to its import, precludes summary judgment for either party on FPP's breach of contract claim. See Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) ("If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment." (quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).)

FPP's Alternative Claim for Fraud

Xaxis also moves for summary judgment dismissing FPP's second claim for fraud, which is pleaded in the alternative to FPP's claim for breach of contract.  Under New York law, to establish a claim for fraud, "a plaintiff must show '(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury.'"  Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir.2009) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996)).

Xaxis' arguments in support of its motion primarily address whether Xaxis made any material misrepresentations, and whether FPP reasonably relied on any such representations if found to be material.  FPP's fraud claim is premised on the argument that FPP received affirmative representations from Xaxis that the Earn-Out Payment would be calculated using revenues, but Xaxis ultimately calculated the Earn-Out Payment using a CPM (the Internal Cross Charge) that reflected cost rather than revenue.  FPP has proffered documentary evidence in support of that proposition, most prominently the Letter of Intent signed between the parties that promised that "revenues attributable by mutual reasonable agreement to the products of the Panache Division" would be credited in calculating the Earn-Out Payment.  The projection document FPP received from Xaxis similarly demonstrates that Xaxis was showing FPP figures relating to revenue, including by providing an estimated CPM that reflected "3rd party agreements" rather than a purely internal figure.  These suffice to raise a question of material fact as to whether Xaxis materially misrepresented its intentions as to how the Earn-Out Payment would be calculated during the negotiation of the APA.

Xaxis' arguments as to whether FPP's reliance on those representations was reasonable are similarly unavailing at the summary judgment stage. "[E]valuation of the reasonable-reliance element has involved many factors to consider and balance, no single one of which is dispositive." STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011). Because of this, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." Id. The parties vigorously dispute the significance of various aspects of the factual record cited by Xaxis in its arguments on this point, making plain that there are disputed issues of material fact that are not susceptible to resolution on summary judgment. A determination as to whether FPP has proven its fraud claim requires findings of fact, and Xaxis' motion for summary judgment on Count Two is accordingly denied.

FPP's Claim for Breach of Contract Relating to the Panache Business Unit

The parties' opposing Rule 56.1 Statements make plain that there is a significant dispute of material fact as to FPP's claim that Xaxis breached the APA by assigning former FPP employees to work on the Palette product. The parties dispute whether Palette was an entirely new product or a product sufficiently based on legacy Panache technology such that it could be considered a Panache Product under the APA. The parties also dispute the nature of the professional services work Xaxis would, or would not, permit legacy FPP employees to undertake after the acquisition. These disputes of fact are material to the determination of whether Xaxis breached the APA's Section 7.4(iv). Accordingly, both motions for summary judgment on this aspect of FPP's claim for breach of contract are denied.

CONCLUSION

For the foregoing reasons, both FPP's and Xaxis' motions for summary judgment are denied in their entirety.

This Memorandum Opinion and Order resolves docket entry nos. 117 and 125. This case remains referred to Magistrate Judge Peck for general pre-trial management. The parties are directed to meet promptly with Judge Peck for settlement purposes. The final pre-trial conference in this matter is scheduled for January 27, 2011, at 11:00 a.m.

SO ORDERED.

Dated: New York, New York
September 29, 2016

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge