UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FFP, LLC, f/k/a PANTHER PANACHE, LLC, | Index No. 14 cv 6172 (LTS)(AJP) |
| Plaintiff, | |
| -against- | |
| XAXIS US, LLC, f/k/a  24/7 REAL MEDIA US, INC. | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION *IN LIMINE* TO
EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, MELISSA SNELSON**

**DAVIS & GILBERT LLP**
Paul Corcoran
1740 Broadway
New York, NY 10019
(212) 468-4800

*Attorneys for Defendant Xaxis US,
LLC f/k/a 24/7 Real Media US, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

I.      LEGAL STANDARD .................................................................................................2

II.     SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED
        BREACH OF SECTION 2.1.2(D) OF THE APA SHOULD BE EXCLUDED. ...............4

III.    SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED
        BREACH OF SECTION 7.4 OF THE APA SHOULD BE EXCLUDED. .......................7

        A.    SNELSON'S OPINION IS UNHELPFUL TO THE COURT AND IS UNRELIABLE ...............9

        B.    SNELSON'S OPINION MAKES IMPROPER LEGAL CONCLUSIONS AND
              REHASHES ALLEGED FACTS ABOUT WHICH SNELSON HAS NO PERSONAL
              KNOWLEDGE ...........................................................................................................12

IV.     SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED
        FRAUD SHOULD BE EXCLUDED. ...........................................................................15

V.      SNELSON'S REPORT AND TESTIMONY ON PREJUDGMENT INTEREST
        SHOULD BE EXCLUDED. ........................................................................................17

CONCLUSION ...........................................................................................................................17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos v. Amtrak,*
    303 F.3d 256 (2d Cir. 2002) ...........................................................................3, 4

*Andrews v. Metro N. Commuter R.R. Co.,*
    882 F.2d 705 (2d Cir. 1989) ...........................................................................5, 17

*Arctic Cat, Inc. v. Sabertooth Motor Grp., LLC,*
    13-146 (JRT/JSM), 2016 U.S. Dist. LEXIS 105583 (D. Minn. Aug. 9, 2016) .....................12

*Bank of N.Y. Mellon v. WMC Mortg., LLC,*
    12cv7096, 2015 U.S. Dist. LEXIS 108320 (S.D.N.Y. Aug. 17, 2015)................................11

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) ....................................................................................4

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ......................................................................................1, 3

*Doehla v. Wathne Ltd., Inc.,*
    98 Civ. 6087 (CSH), 2000 U.S. Dist. LEXIS 9913 (S.D.N.Y. July 17, 2000)......................15

*Gen. Elec. Co. v Joiner,*
    522 U.S. 136 (1997) ......................................................................................3-4

*J&M Distrib., Inc., v. Hearth & Home Techs., Inc.,*
    13-CV-72, 2015 U.S. Dist. LEXIS 2314 (D. Minn. Jan. 9, 2015)........................................14

*Johnson v. Chesebrough-Pond's USA Co.,*
    918 F. Supp. 543 (D. Conn. 1996), *aff'd,* 104 F.3d 355 (2d Cir. 1996)................................15

*Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,*
    3:09cv1546, 2010 U.S. Dist. LEXIS 95092 (D. Conn. Apr. 9, 2010) ....................................5

*New York v. UPS,*
    15-cv-1136 (KBF), 2016 U.S. Dist. LEXIS 123115 (S.D.N.Y. Sept. 10, 2016).....................3

*Pearlman v. Cablevision Sys. Corp.,*
    10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 172080 (E.D.N.Y. Dec. 28,
    2015)...............................................................................................................4, 13

*Point Prods. A.G. v. Sony Music Entm't, Inc.,*
    93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. Feb. 23, 2004) .....................10

*Reis, Inc. v. Spring11 LLC*,
 15 Civ. 2836 (PGG), 2016 U.S. Dist. LEXIS 131486 (S.D.N.Y. Sept. 26,
 2016).................................................................................................................... 15, 17

*Ridge Clearing & Outsourcing Solutions, Inc. v. Khashoggi*,
 07 Civ. 6611 (RJH), 2011 U.S. Dist. LEXIS 91353 (S.D.N.Y. Aug. 16, 2011) .....................4

*Ritani, LLC v. Aghjayan*,
 970 F. Supp. 2d 232 (S.D.N.Y. 2013) ..................................................................................15

*Schwartz v. Fortune Magazine*,
 193 F.R.D. 144 (S.D.N.Y. 2000) .............................................................................. 4, 5, 17

*Scott v. Chipotle Mexican Grill, Inc.*,
 315 F.R.D. 33 (S.D.N.Y. 2016) .............................................................................................5

*SEC v. Tourre*,
 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...................................................................................3

*United States v. Amuso*,
 21 F.3d 1251 (2d Cir. 1994) .................................................................................................5

*Weisgram v. Marley Co.*,
 528 U.S. 440 (2000) .............................................................................................................3

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012) ...............................................................................................12

**Rules**

Fed. R. Evid. 401 ....................................................................................................................4

Fed. R. Evid.702 .........................................................................................................1, 2-3, 9

Defendant Xaxis US, LLC f/k/a 24/7 Real Media US, Inc. ("Xaxis", "24/7", or "Defendant") by and through its counsel, Davis & Gilbert LLP, respectfully submits this Memorandum of Law in support of its motion *in limine* to exclude the expert testimony and expert report (the "Report" and collectively the "Opinion") of the designated expert witness of Plaintiff FFP, LLC, f/k/a Panther Panache, LLC ("FPP", "Panache", or "Plaintiff"), Melissa Snelson, pursuant to Federal Rule of Evidence 702 and the standards articulated in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) ("*Daubert*").

## PRELIMINARY STATEMENT

Xaxis hereby moves to preclude Snelson's Opinion in its entirety. As set forth more fully below, the Report is unhelpful to the Court, conducts no real expert analysis, is based on unfounded speculation, is contradicted by the evidence adduced in this action, and otherwise fails to meet the requirements of Federal Rule of Evidence 702.

This action relates to 24/7's acquisition in 2011 of Panache, a technology company that added user interactivity to internet advertisements. The purchase price was comprised of a $5 million closing payment and a potential earnout payment of up to $13 million. The earnout provision was comprised of seven components, including "Basic Video Media Fees".[1]

After the acquisition, Panache's technology failed to find any meaningful foothold in the market. In fact, Steve Robinson, the principal of Panache, who served as Senior Vice President of Platform Solutions at 24/7 for two years after the acquisition, was unable to make any sales of the Panache technology to publishers between December 1, 2011 and December 31, 2013.

---

[1] The APA defined Basic Video Media Fees as "the fees attributable to Basic Video Media impressions displayed using the Publisher-Side Video Technology (determined on a CPM basis), which shall be the greater of (i) the applicable CPM derived using the same methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving as applied to video serving or (ii) twenty-five percent (25%) of the average CPM for video ad serving earned under third-party agreements for the use of the Publisher-Side Video Technology with Publishers at comparable volumes of impressions to the Global Web Alliance on an annual basis."

Based on the failure of the Panache technology to sell in the market, Panache failed to achieve the earnout. Faced with that failure, Panache concocted breach of contract and fraud claims.

To support its concocted claims, Panache has submitted the Report, which purports to show damages calculations for Panache's claims. However, the Report is facially and fatally flawed. Regarding the alleged breach of Section 2.1.2(d) of the relevant asset purchase agreement (the "APA"), Snelson engages in <u>no</u> expert analysis. Instead, she simply multiplies numbers provided by the Plaintiff. Regarding the alleged breach of Section 7.4 of the APA, Snelson relies entirely on pre-acquisition projections (based on Panache's own self-serving projections) that she played no role in creating. She failed to examine any of the considerations and assumptions that went into the creation of those projections, and she failed to examine any other factors that might have impacted the accuracy of those projections before and after the acquisition. Snelson also uses her already flawed Report to rehash Plaintiff's factual narrative that relates in no way to her purported expert analysis, and she inappropriately makes legal conclusions regarding the APA. Finally regarding the alleged fraud, Snelson's Opinion flatly contradicts established New York law and fails to consider significant evidence adduced in this action that contradicts her conclusions.

Accordingly, as described more fully below, Snelson's Opinion is fundamentally unreliable and provides nothing of evidentiary value to the Court. It should be excluded in its entirety.

## <u>ARGUMENT</u>

### I.    LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony may only be admitted when "[(1)] the testimony is based on sufficient facts or data, [(2)] the testimony is the product of reliable principles and methods, and [(3)] the expert has reliably applied the principles and methods to

the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 588; *Amorgianos v. Amtrak*, 303 F.3d 256, 259 (2d Cir. 2002). In applying this rule, a district court exercises a "gatekeeping role in all trials—bench or jury." *New York v. UPS*, 15-cv-1136 (KBF), 2016 U.S. Dist. LEXIS 123115, at *2-3 (S.D.N.Y. Sept. 10, 2016) ("There are obvious efficiency gains [in bench trials] in precluding testimony from an individual unqualified to take the stand, or one who is providing testimony that is plainly irrelevant or, if relevant, is based upon unreliable methods. Such testimony is a waste of everyone's time. . . . Pre-trial [expert] rulings in the bench context [also] have important strategic implications . . . .").

Based on Rule 702 and *Daubert*, courts in the Southern District have held that a court "must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

Regarding the reliability of the report, a court must apply the "exacting" *Daubert* standards of reliability. *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). "[I]t is critical that an expert's analysis be reliable at every step. . . . [A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267 (internal quotations omitted). A "district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Expert testimony and reports are not reliable, and should be excluded, if they are speculative, unsupported by sufficient facts, or are contrary to the facts of the case. *See id.*; *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) ("Admission of expert testimony based on speculative assumptions is an abuse of discretion.").

Regarding a court's inquiry into helpfulness and relevance, as with any evidence, the Court may admit expert testimony only when that testimony is relevant. *See Amorgianos*, 303 F.3d at 265. In order to be relevant, evidence must have some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*; *see also* Fed. R. Evid. 401. Further, courts in the Southern District have repeatedly declined to allow expert testimony where the evidence is not based on any specialized knowledge or skill. *See, e.g.*, *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000).

Courts in the Southern District have also categorically disallowed: 1) experts to make legal conclusions about how a contract should be interpreted, *see Pearlman v. Cablevision Sys. Corp.*, 10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 172080, at * 31 (E.D.N.Y. Dec. 28, 2015); and 2) experts to simply rehash evidence about which the expert has no personal knowledge, *see Ridge Clearing & Outsourcing Solutions, Inc. v. Khashoggi*, 07 Civ. 6611 (RJH), 2011 U.S. Dist. LEXIS 91353, at *5 (S.D.N.Y. Aug. 16, 2011) ("Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702.").

## II.   SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED BREACH OF SECTION 2.1.2(D) OF THE APA SHOULD BE EXCLUDED.

Snelson's purported damages calculation related to an alleged breach of Section 2.1.2(d) of the APA should be excluded because it is irrelevant and entirely unhelpful to this Court.

Courts in the Second Circuit have consistently held that expert testimony is inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *Schwartz*, 193 F.R.D. at 147 ("The court recognized that this testimony was not generated based on any specialized knowledge, but rather involved basic calculations. . . . Therefore, it was proper to exclude [the expert's] testimony under Rule 702 as 'unhelpful.'" (citation omitted)); *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the . . . subject matter of the expert's testimony is not beyond the ken of the average juror.").[2]

Here, Snelson's expertise is as an accountant. Her "analysis" concerning damages from the alleged breach of Section 2.1.2(d) consists of nothing more than multiplication of numbers provided to her by FPP. Specifically, Snelson was provided a number of impressions, (*see* Report at p. 16, attached to the Declaration of Paul Corcoran ("Corcoran Decl.") as Exhibit A), and she was also provided three CPMs that FPP alleges should have been used as the Basic Video Media CPM, (*id.* at pp. 16-17). Next, Snelson multiplied the CPMs by the number of impressions. (*See id.* at p. 18). This is not expert analysis. No accounting or financial expertise is required to multiply numbers provided by the Plaintiff. The real issues in the action are questions of fact: 1) what is the appropriate Basic Video Media Fee CPM; and, 2) what is the relevant number of impressions. Once this Court makes those determinations, it will be more

---

[2] *See also Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 3:09cv1546 (MRK), 2010 U.S. Dist. LEXIS 95092, *13 (D. Conn. Apr. 9, 2010) ("As the above-quoted passages are meant to illustrate, Mr. Koliani's task was a narrow one: add up the numbers Plaintiff's counsel told him to add up, apply the interest rate that Plaintiff's counsel told him to apply, and ignore virtually everything else. There is nothing that Mr. Koliani was asked to do that a jury of laypeople could not do equally well. In fact, a jury would probably do a better job, as it would at least apply a dose of skepticism to what the attorneys tell it."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 56 (S.D.N.Y. 2016) ("For his testimony to be admissible, an expert must 'utilize his expertise in order to aid the finder of fact in understanding esoteric or complex evidence.' . . . An expert is precluded from offering testimony that is not based on any specialized knowledge, but rather involves 'basic calculations.' . . . Dr. Johnson simply looks at the data and identifies categories of apprentices. This is not expert analysis.").

than capable of multiplying those two numbers together, which neither party disputes is the appropriate calculation.

A cursory review of the Report shows that it is nothing more than an unhelpful recitation of numbers provided in other documents, with no independent analysis applied by Snelson. For example, Snelson spends three pages of her report to "calculat[ing]" the "undisputed minimum amount of 2013 Net Revenue" to which she proposed to add a Basic Video Media Fee calculation based on a frivolous CPM construction provided by FPP. (*See id.* at pp. 12-14). But those "undisputed minimum amount of 2013 Net Revenue numbers" needed no "calculating". Plainly read, all Snelson's Report did was adopt and repeat the various revenue numbers presented by Deloitte, reduced by $3,220 to reflect an alleged discrepancy between 24/7's numbers and the later Deloitte numbers. (*Id.*). It is a meaningless exercise that that regurgitates numbers and engages in simple arithmetic to reduce the earnout-calculation attribution by the $3,220. Snelson later merely recites numbers provided by Steve Robinson, FPP's primary witness and representative, to "calculate" Robinson's preferred CPM.[3] (*See id.* at pp. 16-17). Moreover, the Opinion is irrelevant—Snelson's multiplication of numbers provided by the Plaintiff does not make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the expert's opinion.

Allowing Snelson to enter her Opinion and Report provides nothing more than the opportunity for FPP to attempt to reinforce its deliberate misconstruction of the written contract and evidence in this case. (*See, e.g.*, *id.* at pp. 14, 16 (taking out of context an e-mail from Jason

---

[3] Notably, the CPMs that Snelson uses represent entire CPMs paid by advertisers, a measure that this Court has already concluded is not proper under the plain language of the APA. (*See* Dkt. 207 pp. 8-9 (noting that "FPP's proposed construction of the contract does not appear to square with the APA's plain language either. . . . Section 2.1.2(d)(i) points to a methodology used to derive the CPM 'charged to the Global Web Alliance' . . . not a methodology used to derive the CPM charged to advertisers.").

Ross to Larry Allen regarding advertiser CPMs)).    Accordingly, the Court should exclude Snelson's Opinion relating to damages for alleged breach of Section 2.1.2(d) of the APA.

III.    **SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED BREACH OF SECTION 7.4 OF THE APA SHOULD BE EXCLUDED.**

Snelson's purported damages calculation based on an alleged breach of Section 7.4 is also inadmissible for numerous reasons. It is speculative, unreliable, and not based on any real methodology. Again, Snelson simply recites numbers without providing any analysis. Further, Snelson's purported Section 7.4 damages calculation makes bald legal conclusions and serves primarily as a mouthpiece to rehash FPP's frivolous factual narrative.

The actual "calculation" for Snelson's Section 7.4 Opinion is based entirely on a projection sheet (the "Projection Sheet") sent by Xaxis to FPP on November 1, 2011. The e-mail transmitting that Projection Sheet described the projections as "initial" projections. (*See* FPP_0008873, attached to the Corcoran Decl. as Exhibit B). The projections included in the Projection sheet were based on FPP's own speculative and "aggressive" projections that were provided to Xaxis during the acquisition process. (*See* Dkt. 118, Ex. 49 at 25:13-21; XA-AP-00322826, attached to the Corcoran Decl. as Exhibit C). Although it believed that FPP's projections were aggressive, Xaxis accepted those projections for the purposes of illustration and discussion only. (*See id.*; *see also* Dkt. 118, Ex. 2 (Robinson Dep. Trans.) at 167:7-13 ("[T]he first thing we did was walk through the stand-alone projections. And he told me: 'Steve, I took your 2012 estimates, and increased them by a percent.'"). Additionally, the initial Projection Sheet contained a disclaimer stating that the Projection Sheet was for "ILLUSTRATION AND DISCUSSION PURPOSES ONLY." (*See* Ex. B at FPP_0008874-75) (emphasis in original). The initial Projection Sheet also stated that the numbers were based on assumptions on the

second page of the sheet.  (*Id.*).  Among the other assumptions used to make the initial projections was a Basic Video Media Fee CPM of 1.75 cents.  (*Id.*).

Notably, throughout this litigation, FPP has repeatedly argued that the Projection Sheet was unreliable and should be ignored.  Among other things, FPP has claimed that the Projection Sheet is "error-filled" and made "obsolete" by continued discussions.  (*See* Dkt. 36 at p. 2 (claiming that there is a "clear inaccuracy on the face of the [November 1 Projection Sheet]"); Dkt. 127 at ¶ 41 (noting that the projections were "FOR ILLUSTRATION AND DISCUSSION PURPOSES ONLY."); Dkt. 141 at pp. 3, 20 (noting that the Projection Sheet has mathematical errors, calling the Projection Sheet "error-filled", noting that the Projection Sheet does not reflect the mutual understanding that the parties reached, and noting that the Projection Sheet "became obsolete during the negotiation weeks that followed"); Dkt. 143 at p. 30 (noting mathematical inaccuracies of the Projection Sheet and disclaiming the ability to rely on the projection sheet because it was for illustration and discussion only); Dkt. 152 (calling the projection sheet "error-filled"); Dkt. 118, Ex. 66 at 509:4-5 (Steve Robinson claiming that Sheila Spence, one of the individuals who negotiated APA on behalf of Xaxis, thinks the Projection Sheet is imprecise)).

Despite the Projection Sheet's obvious disclaimers and FPP's repeated assertions that the Court should ignore the Projection Sheet, Snelson admits that the methodology she used to calculate the purported damages stemming from an alleged breach of Section 7.4 of the APA was based entirely on the November 1, 2011 initial projections that Xaxis sent to FPP.  (*See* Ex. A at p. 19).  Based only on that projection sheet, Snelson claims that Panache was damaged in the amount of $6.0 to $8.6 million by the purported "diversion of the legacy Panache employees."  (*Id.*).  As described below, however, Snelson's Opinion contains no real expert analysis, fails to

8

connect the purported damages to the alleged breach and the evidence in the case, is unreliable, and otherwise fails to meet the Rule 702 requirements.

A.   <u>S</u>NELSON'S <u>O</u>PINION IS <u>U</u>NHELPFUL TO THE <u>C</u>OURT AND IS <u>U</u>NRELIABLE

By relying only on the speculative and self-serving projections initially created by FPP, Snelson has failed to consider any of the actual evidence adduced about FPP's business both before and after the acquisition. Accordingly, Snelson's Opinion entirely fails to connect any of the alleged violations to the purported damage that occurred. For example, Snelson does not, and cannot, account for the fact that prior to the acquisition, FPP only had, at most, four employees engaged in sales of the Panache technology, while the rest of the Panache employees were engaged in various technical roles. (*See* Dkt. 118, Ex. 2 at 350:2-9). In 2009 and 2010, that four person sales team generated total revenues of $1,020,042 and $1,354,057 respectively. (*See* Dkt. 118, Ex. 3). Steve Robinson has admitted that he, Jill Druschke, and Tim Bagwell continued to sell the Panache product after the acquisition. (Dkt. 118, Ex. 2 at 351:4-12). Further, after the acquisition, Xaxis designated substantial additional sales resources, including around 40 additional 24/7 employees selling and supporting the Panache technology. (*See, e.g.*, Dkt. 118, Ex. 7 at 52:10-21, 77:7-79:5, 125:11-127:22; Ex 49 at 182:11-183:4). Even if there were a violation of 7.4, and there was not, Snelson entirely fails to explain, or conduct any real analysis of, how the purported misuse of a few legacy Panache employees, who were not sales people, could possibly have caused the $6.0 to $8.6 million in damages she "calculates" in her Opinion. Put another way, Snelson offers no rational connection in her Report between the alleged misuse of a few (non-sales) technical personnel on purportedly non-Panache projects and any short fall in the Panache earnout revenues realized by the substantial staff that 24/7 devoted to attempting to sell the Panache technology in 2013.

In addition to failing to provide any analysis of how the purported misuse of non-sales employees could have caused the damages claimed in this Action, Snelson also failed to consider the evidence of the events that actually occurred after the acquisition and other factors that might have impacted Panache standalone revenue. For example, Snelson failed to consider evidence that shows that at least one of the Panache legacy clients terminated its relationship immediately after the acquisition, before any impact from use of Panache employees could have been felt. (*See* FPP_0073647 (Muzu terminating its relationship with Panache on January 30, 2012), attached to the Corcoran Decl. as Exhibit D). Similarly, Snelson also failed to consider existing problems with FPP's business that might have an ongoing or increasing impact on its revenues. For example, Steve Robinson testified that prior to the acquisition, FPP "lost a stranglehold on the marketplace [after its proprietary technology was disclosed to the public] because now there was a way other companies could use an IAB standard to effectively compete with [FPP]." (*See* Dkt. 118, Ex. 2 at 84:16-20). Snelson also fails to consider that Steve Robinson himself requested that certain legacy Panache employees spend less time servicing MTV and Channel4, legacy Panache clients, and more time on the media side. (*See* Dkt. 118, Ex. 44). Senlson's failure to consider the actual circumstances that followed the acquisition also renders Snelson's Opinion unreliable. *See Point Prods. A.G. v. Sony Music Entm't, Inc.*, 93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676, at *24-25 (S.D.N.Y. Feb. 23, 2004) ("Standing alone, these assumptions might not render Churchill's report and anticipated testimony unreliable. But when his willingness to rely on these sometimes questionable assumptions is considered in light of the report's gaping omissions of real world events that were highly material to Point's vitality and unrelated to Sony's termination, Churchill's testimony is left irretrievably unreliable and indefensible.").

Further, Snelson's Opinion stemming from the Projection Sheet is also unreliable as Snelson has reviewed no evidence about the creation of the Projection Sheet. *See Bank of N.Y. Mellon v. WMC Mortg., LLC*, 12cv7096 (DLC), 2015 U.S. Dist. LEXIS 108320, at \*23-24 (S.D.N.Y. Aug. 17, 2015) (excluding portions of an expert report where expert relied on facts and data gathered by people "whose methodology the expert did not design, whom he did not directly or indirectly supervise, and over whom he did not impose quality control" because the expert does not know the experience of the people preparing the data, the instructions they received, and the extent to which their work was subject to quality control). Here, as disclosed in her report, Snelson has not reviewed the internal communications about the Xaxis' assumptions or calculations underlying the Projection Sheet. (*See generally* Ex. A at Exhibit 1). She therefore has no knowledge of the instructions that the people preparing the Projection Sheet received. Had she reviewed the pertinent communications, she would have learned that Xaxis considered the standalone projections "aggressive" projections created by FPP to drive up the purchase price. (*See* Ex. C (noting that Xaxis thought "Panache's own standalone revenue projections were optimistic but accepted [the projections] as [Xaxis] felt it would ultimately lower the purchase price."); *see also* Dkt. 118, Ex. 49 at 25:13-21). For the purposes of the initial Projection Sheet, however, Xaxis merely accepted the aggressive projections provided by FPP. (*See id.*; *see also* Dkt. 118, Ex. 2 at 167:7-13 ("[T]he first thing we did was walk through the stand-alone projections. And he told me: 'Steve, I took your 2012 estimates, and increased them by a percent.'"). Accordingly, Snelson's Opinion is unreliable, based entirely on the speculative, aggressive projections, which were accepted by Xaxis solely for the purpose of a demonstrative calculation.[4]

---

[4] Snelson's Opinion is also unreliable because she relied solely on speculative, self-serving projections originally created by FPP to drive up the purchase price during negotiations of a potential acquisition. Further, even FPP itself

Beyond the numerous reasons why Snelson's Opinion on 7.4 damages is deficient, the analysis itself is unhelpful as it is meager and does not speak to the factual issues that need to be resolved with respect to FPP's 7.4 claim. In sum, Snelson's analysis comes down to one sentence in which she concludes that growth assumptions were reasonable, considering only two-years of FPP's past revenues and market reports generally. However, as previously discussed, even if Snelson's Opinion on growth assumptions were accepted by the Court, her failure to consider any subsequent factors renders her damages calculations meaningless. It is clear from this "analysis" that Snelson is doing nothing more than rubber-stamping the positions of FPP's attorneys.

In sum, Snelson's Opinion on 7.4 damages is entirely unreliable. The methodology completely ignores the evidence of what actually occurred before and after the acquisition that might have impacted Panache's revenues.[5] Further, Snelson's methodology essentially relies entirely on a self-serving, aggressive set of projections originally created by FPP to increase the purchase price, rendering her Opinion speculative and unreliable.

**B.    SNELSON'S OPINION MAKES IMPROPER LEGAL CONCLUSIONS AND REHASHES ALLEGED FACTS ABOUT WHICH SNELSON HAS NO PERSONAL KNOWLEDGE**

Snelson's Opinion on purported 7.4 damages should also be excluded because she makes improper legal conclusions. In her background discussion of the Section 7.4 of the APA, Snelson repeatedly opines on the meaning of, and motive behind, language from the APA. For example, Snelson writes "I understand that [Section 7.4] sets forth certain protections . . .

---

has stressed the Projection Sheet was for "ILLUSTRATION AND DISCUSSION PURPOSES ONLY". (See Ex. B). Courts generally decline to allow expert opinion based on this type of preliminary projections. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) ("[T]he District Court acted within its discretion in determining that one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown, did not provide 'good grounds,' for DeRamus to generate his damages estimate.").
[5] Notably, Snelson has previously had an expert report and testimony excluded for failing to base her damages calculation on the actual facts bearing on damages in the case. *Arctic Cat, Inc. v. Sabertooth Motor Grp.*, LLC, 13-146 (JRT/JSM), 2016 U.S. Dist. LEXIS 105583, at *7-10 (D. Minn. Aug. 9, 2016).

12

designed to ultimately ensure that 24/7 would not impair Panache's ability to generate certain revenues that would count towards its Net Revenue and its earn-out." (Ex. A at p. 6). Similarly, Snelson writes that "Section 7.4 effectively sets limits on the actions 24/7 is allowed to take during the earn-out period . . . ." (*Id.*). Later, Snelson claims that "Palette was not listed as a 'Panache Product' in the APA" and that "Palette was not a Panache Product. It was designed to compete with and replace existing Panache Products." (*Id.* at 8).

Each of these improper assertions goes to the heart of the contractual interpretation issues involved in this Action. Xaxis and FPP have repeatedly contested the meaning of, and motive behind, Section 7.4. (*See, e.g.*, Dkt. 148 at pp. 21-23 (refuting FPP's interpretation of Section 7.4). The parties have also repeatedly contested whether Palette constitutes Publisher Side Video Technology, a term that was listed in the APA as a Panache Product. (*See id.*). Snelson's bald assertions about how Section 7.4 of the APA should be interpreted are therefore beyond the scope of allowable expert testimony and should be excluded. *See Pearlman v. Cablevision Sys. Corp.*, 10-CV-4992(JS)(GRB), 2015 U.S. Dist. LEXIS 172080, at * 31 (E.D.N.Y. Dec. 28, 2015) ("Indeed, expert witness testimony should not be permitted where the expert testifies to what is necessary to fulfill the covenant (of the contract)." (internal quotations omitted)). Further, these assertions go well beyond Snelson's purported expertise as an accountant.

Additionally, Snelson uses a large portion of her 7.4 Opinion to simply regurgitate FPP's factual position (much of which is vigorously contested by Xaxis) in a way that does not at all relate to her Opinion. At the outset, Snelson acknowledges her Report "does not intend to express any opinions regarding the Defendant's liability in this matter." (Ex. A at p. 1). Further, Snelson notes that she was asked to "assume . . . that judgment [was] entered in favor of FPP for at least one of the two counts alleged and 24/7 is found liable for damages." (*Id.* at p. 3). Yet,

despite making those assumptions, Snelson proceeds to enumerate FPP's factual interpretation regarding liability for nearly five pages. (*Id.* at pp. 7-12). Many of these factual assertions are taken out of context, and some are simply incorrect or unsupported by the evidence cited by Snelson. For example, Snelson notes that Nicolle Pangis testified that she "kn[e]w Panache people moved responsibilities after the acquisition." (*Id.* at p. 8). Snelson omits critical content from that sentence, which ends with Nicolle Pangis testifying that the purpose of the moves were to "integrate the Panache team into our broader team to drive as much business as we could collectively." (*See* Dkt. 118, Ex. 7 at 160:15-18). Snelson also omits, or failed to consider, the fact that Steve Robinson himself requested that the Panache team be integrated into 24/7. (*See* Dkt. 118, Ex. 42 (noting, among other things, that Panache employees are not "sure if they[ are] going to be a standalone group, or as per plan moved into other groups . . . .")).

These five pages of "facts" (of which Snelson has no personal knowledge and which do not concern her area of expertise) are nothing more than an impermissible attempt to bolster FPP's factual position on liability in a way that has no relation to the purported expert opinion offered by Snelson. Notably, in another case, Snelson's expert report was excluded in part for this exact type of impermissible conduct. *See J&M Distrib., Inc., v. Hearth & Home Techs., Inc.*, 13-CV-72 (SRN/TNL), 2015 U.S. Dist. LEXIS 2314, at *18-25 (D. Minn. Jan. 9, 2015) (excluding portions of Snelson's report and noting that "[a]lthough Snelson opines that she merely assumed liability for purposes of conducting her damages analysis . . . her opinion ventures beyond simple assumptions. . . . These statements do not concern the calculation of damages — Snelson's area of expertise — and many of them relate directly to issues of liability.").

## IV.    SNELSON'S REPORT AND TESTIMONY ON DAMAGES FOR AN ALLEGED FRAUD SHOULD BE EXCLUDED.

Snelson's purported damages calculation based on FPP's fraud allegation should be excluded because it is contrary to New York law and fails to consider necessary evidence. Moreover, as with the other parts of the Report, Snelson's "analysis" regarding the alleged fraud consists of nothing more than simple math.

First, under New York law, a Plaintiff must demonstrate that a fraudulent misrepresentation directly and proximately caused the plaintiff's damages. *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 549 (D. Conn. 1996), *aff'd,* 104 F.3d 355 (2d Cir. 1996). Importantly, New York law awards only "out-of-pocket" damages in fraud cases, entitling plaintiffs to damages solely for their actual pecuniary losses. *Reis, Inc. v. Spring11 LLC*, 15 Civ. 2836 (PGG), 2016 U.S. Dist. LEXIS 131486, at *31 (S.D.N.Y. Sept. 26, 2016). "[U]nder the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud." *Id.* at *32 (internal quotations omitted); *see also Ritani, LLC v. Aghjayan*, 970 F. Supp. 2d 232, 251-252 (S.D.N.Y. 2013) ("In essence, HR Corp. seeks to recover the benefit of what it claims would have been two alternative contracts. . . . However, in New York, 'the loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was undeterminable and speculative.'" (citations omitted)).[6]

Here, Snelson's fraud damage calculation purports to rely on the value of a potential alternative bargain. Specifically, Snelson notes that "[a]t approximately the same time that Panache was discussing selling its assets to 24/7, Panache was also in similar discussions with

---

[6] Snelson's Report cites *Doehla v. Wathne Ltd., Inc.*, 98 Civ. 6087 (CSH), 2000 U.S. Dist. LEXIS 9913 (S.D.N.Y. July 17, 2000) to suggest that fraud damages can be based on a potential alternative bargain. (*See* Ex. A at p. 20 n.73). However, the court in *Doehla* was careful to note that "[i]t is of course well settled that damages may not be recovered if, in the circumstances of the case, they are speculative or remote." *Id.* at *18.

ARRIS Group, Inc. ('Arris')."  (Ex. A at p. 21).  Snelson states Panache received a letter of intent from Arris on August 16, 2011, and opines that "Panache would have almost certainly earned at least $10 million from the sale of its assets to Arris, *had it chose to go through with that transaction*."  (*See id.*) (emphasis added).

It is improper, however, for Snelson to rely on the potential alternative Arris deal as a basis for fraud damages.  The evidence adduced in this action flatly contradicts Snelson's assertion that Panache could simply "cho[o]se to go through with the transaction."  Instead, the evidence shows that the Arris deal was still speculative and uncertain.  First, the letter of intent noted that the "proposal is conditional upon the completion of due diligence, and the negotiation and execution of a mutually acceptable definitive acquisition agreement."  (*See* FPP_0000036 at FPP_0000038, attached to the Corcoran Decl. as Exhibit E).  Next, Snelson omits (or failed to consider) the fact that just two days after sending the letter of intent, Arris changed a "material" term of the potential deal to the detriment of FPP.  Specifically, after sending a letter of intent with certain metrics based on Panache's revenue, Arris changed those metrics to be based on Panache's EBITDA after the potential acquisition.  (*See* FPP_0005044 at FPP_0005045, attached to the Corcoran Decl. as Exhibit F).  Robinson himself admitted that this change was "new" and different from the understanding of the FPP investors.  (*Id.*)  Additionally, even after receiving the letter of intent, Robinson also noted to his investors that there is "no certainty in [the Arris] deal" and said that he was "always apprehensive about Arris closing."  (*See id.*).  This change of a material term after the letter of intent was signed shows and Robinson's own concerns show that the terms of the deal remained speculative and a closing was uncertain.

Further, Snelson cannot know or opine on what provisions a final purchase agreement between Arris and FPP would have included.  It is entirely possible that after negotiations, any

closing payments might have been subject to scaling based on Panache's results after the acquisition. (*Cf.* Dkt. 118, Ex. 39 at § 2.1.1 (b) (disclaiming any "give back" requirement should the earnout calculation yield a negative number)). Considering the failure of the Panache technology to find a meaningful foothold in the marketplace, if an eventual purchase agreement with Arris contained such a scaling provision based on results, it is likely that FPP would not have retained the entire speculative $10 million closing price.

For the foregoing reasons, it is thus inappropriate for Snelson to rely on this speculative alternative bargain under the New York "out-of-pocket" rule. *See Reis, Inc.*, 2016 U.S. Dist. LEXIS 131486, at *31.

Further, regardless of the legal determination of whether any damages are speculative and contrary to New York law, Snelson also does not provide any aid to this Court with her "analysis" regarding potential fraud damages. The Report simply references a letter of intent and "calculates" damages by subtracting the $5 million closing payment made to FPP by Xaxis from the potential closing and integration payments referenced in the letter of intent. This "analysis" is nothing more than a basic calculation that is not beyond the understanding of this Court.

## V.    SNELSON'S REPORT AND TESTIMONY ON PREJUDGMENT INTEREST SHOULD BE EXCLUDED.

As with the other "analysis" in the Report, Snelson's purported prejudgment interest calculation should be excluded because it consists of nothing more than basic calculations. *See Andrews*, 882 F.2d at 708; *Schwartz*, 193 F.R.D. at 147.

## CONCLUSION

For the foregoing reasons, Defendant's motion *in limine* should be granted, and the Court should exclude Snelson's Opinion.

Dated:  New York, New York
        December 28, 2016

                              DAVIS & GILBERT LLP

                              By:      /s/Paul Corcoran
                                     Paul F. Corcoran
                                     1740 Broadway
                                     New York, NY  10019
                                     (212) 468-4800
                                     pcorcoran@dglaw.com
                                     *Attorneys for Defendant*