USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/15/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FFP, LLC, f/k/a PANTHER PANACHE, LLC,

                  Plaintiff,

-against-

XAXIS US, LLC, f/k/a 24/7 REAL MEDIA US, INC.

                  Defendant.

Index No. 14 cv 6172

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL**

      This lawsuit arises over the correct interpretation of Section 2.1.2(d) of an acquisition agreement, whereby Defendant acquired Plaintiff. In November of 2011, Plaintiff and Defendant entered into an Asset Purchase Agreement, under which, in addition to other consideration, Defendant agreed to pay Plaintiff an "earnout" amount if revenue in 2013 exceeded a certain threshold amount. Plaintiff alleged that Defendant breached § 2.1.2(d) of the Agreement, the provision defining revenue relating to "Basic Video Media Fees." Plaintiff argues that the provision refers to the fees that *advertisers* pay. Defendant argues that the provision refers to the fees that *publishers* pay. Under Plaintiff's construction, the provision credits Plaintiff with over $7 million of revenue; under Defendant's, with approximately $10,000. I hold in these findings of fact and conclusions of law that Defendant's interpretation is correct; that Defendant did not breach the contract; and that Plaintiff's complaint is dismissed.[1]

---

[1] The Court has diversity jurisdiction pursuant to 18 U.S.C. § 1332(a)(1). Venue is based on 28 U.S.C. §1391(b)(1).

1

## FINDINGS OF FACT

### I. Parties

1. Plaintiff FPP, LLC, f/k/a Panther Panache, LLC, ("FPP" or "Panache") was co-founded in 2006 by Steven Robinson and Alexander Krassel as a company offering software and professional services to internet advertisers and publishers.

2. Defendant Xaxis US, LLC, formerly known as 24/7 Real Media US, Inc., was also in the business of offering software and business solutions to internet advertisers and publishers.

3. Defendant acquired Plaintiff on November 30, 2011. The Asset Purchase Agreement ("APA"), signed by Panache and 24/7, effectuated the acquisition.

### II. Digital Advertising Background

4. Digital advertising includes "advertisers" and "publishers." Advertisers are those who seek to have their advertisements ("ads"), either in display or video format, shown on a website. Publishers are the website operators who provide the space to the advertisers. Advertisers pay publishers for the use of this website space, much like advertisers pay owners of billboards to display ads on the billboards' space. In the industry, advertisers are known as the "demand side," and publishers as the "supply side."

   a. Some websites, just like some well-placed billboards, attract more eye-traffic, making those "premium" publisher spaces higher-valued. Such premium publishers often contract directly with willing advertisers who wish to pay for such premium space.

   b. When a publisher displays a particular ad, each display is referred to as an "impression." Advertisers typically pay publishers for every thousand impressions

of an ad, referred to as "cost-per-thousand" or "CPM." For example, a CPM of $1.00 means that, for 5,000 impressions, the advertiser pays $5.00.

    c. For video ads, payments by advertisers to publishers typically fall in the range of $8–$20 CPM.

5. In addition to publishers and advertisers, there are two other parties relevant to this suit: "ad-serving" technology providers, and "middlemen."

6. "Ad-serving" technology helps publishers display and track ads efficiently on their websites. To "serve" an ad is to display it. Publishers *pay* third-parties to license and use such ad-serving software. This represents a *cost* to publishers, akin to the cost a billboard owner incurs in hiring a painter (ultimately on behalf of the advertiser) to paint or "serve" an ad onto the billboard.

    a. Publishers license ad-serving technology on a CPM basis. For every thousand impressions served on the publishers' websites, the publishers pay the licensing fees at the given CPM rate.

    b. The CPM range for publisher-side ad-serving technology is $.05–$.20.

    c. *Advertisers* might also pay and use ad-serving software in order to "track" how many of their ads are being served. Most relevant to this suit, however, is *publisher*-side ad-serving software.

7. "Middlemen" broker between advertisers and publishers. Due to insufficient advertiser size or demand, non-premium publishers cannot feasibly contract directly with advertisers. Middlemen aggregate publishers and their audiences to increase use by advertisers.

a. Middlemen contract with advertisers and charge them for the use of an aggregate of publisher website spaces. The middlemen then remit part of the collected fees to the individual publishers and retain the balance for their own use and profit.

b. Much like an individual publisher, middlemen need to obtain licenses to ad-serving technology in order to serve ads across publisher websites.

c. Middlemen are *paid* by advertisers on a CPM basis, *i.e.*, $8–$20, and *pay* to license ad-serving software also on a CPM basis, *i.e.*, $.05–$.20.

### III. Panache's and 24/7's Roles in the Digital Advertising Industry

8. At the time it acquired Panache, 24/7 had two divisions: the "technology" side and the "media" side.

a. The technology (or "publisher") side developed ad-serving technology called Open Adstream ("OAS"). 24/7 would license this technology to *publishers* (thus the term "publisher" side). In this capacity, 24/7 was a third-party technology-provider, with respect to the contract between independent publishers and advertisers.

　　i. The technology side would license this software to publishers on a CPM basis, typically in the range of $.05–$.20.

b. The media side, on the other hand, was a middleman business (as described above) that aggregated the website spaces of many publishers. This aggregation was called the "Global Web Alliance" ("GWA").

　　i. 24/7, through the GWA, would charge advertisers to display ads across participating publishers' websites, typically on a formula ranging between $8–$20 CPM for video advertisements. 24/7 would remit approximately

        50% of the gross payments from advertisers to participating publishers and retain the balance. The publishers paid no other fees to 24/7 for brokerage services.

    ii. 24/7 used technology developed by its technology side to serve such ads on the GWA, without directly charging licensing fees to publishers on the GWA. The fictional licensing cost, considered by 24/7 an expense to GWA revenue, was reflected as an "internal" charge, calculated on a CPM basis roughly equivalent to normal charges for licensing fees for ad-serving technology licensed to publishers generally.

9. Prior to being acquired by 24/7, Panache had a creative services team that designed custom-built ad formats that publishers and advertisers could use to "enhance" video ads.

10. Panache also developed and owned software called "Ad Flow," which helped serve video ads. 24/7 had video-serving technology before it acquired Panache, but it used Ad Flow to improve the operations of video ad-serving.

### IV. Structure of the Acquisition

11. The acquisition was negotiated between June and November 30, 2011, with 24/7 represented mainly by Sheila Spence and Robert Schneider, and Panache by Steven Robinson and James McGuire.

    a. 24/7 anticipated that the acquisition of Panache would create synergy between Panache's video technology and 24/7's ad-serving and media businesses.

12. On August 18, 2011, the parties signed a letter of intent, describing the structure of the acquisition, later embodied in the terms of the APA. *See* D. Ex. H.

13.     According to the APA, 24/7 was to pay Panache $5 million at closing ("closing payment"). *See* § 2.1.1(a)(i).

14.     In addition, Panache was to receive an "earnout" based on Panache's performance, at two times the "Net Revenue" of 2013, minus the closing payment, or "(2 x 2013 Net Revenue) – CP." *See* § 2.1.1(b).

   a. For example, if net revenue in 2013 was $7 million, Panache would receive an earnout of $9 million; *i.e.*, (2 x $7 million) – $5 million = $9 million.

   b. However, if 2013 net revenue was $2.5 million or less, no earnout payment would be due.

15.     The "Maximum Purchase Price" was capped at $18 million which, minus the $5 million CP, yields a maximum earnout of $13 million. *See* § 2.1.1(c).

### V.     Components of "Net Revenue"

16.     "Net Revenue" comprises seven categories of revenue: (i) Client Billings, (ii) Publisher Side Video Technology License Fees, (iii) Publisher Side Video Technology Usage Fees, (iv) Trial Credit Fees, (v) Basic Video Media Fees, (vi) Enhanced Video Media Fees, and (vii) Professional Services. *See* § 2.1.2(a). "Net Revenue" is further reduced by, among other things, "any pass-through costs, third party revenue share obligations, publisher remittances . . . (other than in the case of the Panache Enhanced Media Fees and Basic Video Fees) . . . ." *See* § 2.1.2(a)(3).

   i. **Client Billings:** This category credits Panache with "all client billings directly attributable to the sale of Panache Creative Ad Units, according to the cost per thousand impressions ("CPM") rate set forth in the client contracts memorializing the sale of such Panache Creative Ad Units." §2.1.2(a)(i).

ii. **Publisher-Side Video Technology License Fees:** This category credits Panache with the "aggregate license fees" paid to 24/7 by any Publisher "under the client contract with such Publisher memorializing the license fees of such Publisher Side Video Technology." § 2.1.2(o).

iii. **Publisher-Side Video Technology Usage Fees:** This category is the same as category (ii), except that the fees refer here to *usage* fees provided in the client contracts, rather than *license* fees.

iv. **Trial Credits:** This refers to credits where Publisher Side Video Technology is given to publishers as a "trial" without charge.

v. **Basic Video Media Fees:** This category credits Panache with a tech-serving fee for video media displayed on the GWA that is not enhanced by Panache's Creative Ad Units. Panache is credited with an implied CPM, defined in succeeding paragraphs, relating to publisher-side video ad-serving technology that is provided by 24/7's technology division and used to serve video impressions on 24/7's Global Web Alliance. § 2.1.2(d).

vi. **Enhanced Video Media Fees:** This category credits Panache for video media displayed on the GWA that is enhanced by Panache's Creative Ad Units, according to "aggregate billings" charged by 24/7 and paid by advertisers, minus "revenue-share obligations" with publishers. § 2.1.2(h).

vii. **Professional Services:** This category credits Panache with "client billings" attributable to the services Panache personnel provided to clients. § 2.1.2(a)(vii).

17.     Categories (i), (ii), (iii), (vi), and (vii) credit Panache according to *actual* billings by 24/7 pursuant to contract provisions with third-parties. Category (v) credits Panache with an implied CMP reflecting an internal charge to one 24/7 division and a credit to another.

## VI.  "Basic Video Media Fee" Category of Net Revenue

- "Basic Video Media," as defined by APA § 2.1.2(c): "shall mean all video impressions displayed by Publishers on the 24/7 Group's Global Web Alliance ad network and through the use of the Publisher-Side Video Technology that do not incorporate any Panache Creative Ad Unit."

- "Basic Video Media Fees," as defined by APA § 2.1.2(d): "shall mean the fees attributable to Basic Video Media impressions displayed using the Publisher-Side Video Technology (determined on a CPM basis), which shall be the greater of (i) the applicable CPM derived using the same methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving as applied to video serving or (ii) twenty-five percent (25%) of the average CPM for video ad serving earned under third-party agreements for use of the Publisher-Side Video Technology with Publishers at comparable volumes of impressions to the Global Web Alliance on an annual basis."

## VII.  Parties' Earnout Contentions

18.     The parties agreed to the revenue amounts to be credited to Panache under all categories other than Basic Video Media Fees ("BVMF") under § 2.1.2(d). The agreed upon amounts add to $1,746,638.[2] *See* D. Ex. F-4; Transcript, Dec. 12, 2017, pp. 466–68, 523–24; Transcript, Dec. 11, 2017, pp. 392–94.

19.     The parties also agreed to the relevant number of impressions to be used for calculating BVMF. The number is 1,058,760,000 impressions.

---

[2] $518,411 is credited for Enhanced Video Media Fees, which represents $1,214,955 in aggregate billings, minus $696,544 in revenue-sharing obligations per § 2.1.2(h). $465,000 is credited for Publisher Side Video Technology. $763,227 is credited for Creative Ad Units. The revenue for all other categories aside from BVMF is 0.

8

20. Plaintiff contended BVMF to be between $5–9 million. It based its contentions on a CPM charged to advertisers.

21. Defendant contended BVMF to be $10,587.60. It based its contentions on the CPM internally charged within 24/7 for ad-serving, $.01 (1 cent). That CPM, multiplied by 1,058,760,000 impressions, yields $10,587.60 for BVMF.[3]

22. To derive the CPM of $.01, Defendant divided total monthly impressions of 114.1 billion by total monthly operating costs of $1,201,000 to equal $.0105 (1.05 cents). *See* P. Ex. 67.

23. Plaintiff argues, however, that § 2.1.2(d) refers to the CPM that *advertisers* pay to display video ads on the GWA, typically in the range of $8–$20. Plaintiff, reviewing all bills to advertisers, determined that CPM to range from $2.5 to $25, with an average of $9.36. Plaintiff then multiplied the number of impressions for each advertiser and calculated BVMF to be $7,376,121.68. *See* D. Ex. Z-3. Robinson testified that statements made by Schneider during negotiations gave him the understanding to base BVMF revenues on advertisers' CPM. As discussed below, and in light of all the evidence, I find that testimony not to be credible.

**VIII. Evidence at Trial**

*Panache Understood that §2.1.2(d) Referred to an "Ad/Tech-Serving Fee"*

24. Robinson testified that he did not know what an ad- or tech-serving fee was. However, deposition testimony and documentary evidence showed that he knew that an ad-serving fee was a charge to publishers in the nature of a licensing fee and in the range of $.05–$.25 (5–25 cents) CPM.

---

[3] The parties agreed that the disputed issues of the trial involved only §2.1.2(d)(i). The parties agreed that subdivision (ii) of § 2.1.2(d) was not relevant since there were no fees earned under third party agreements with comparably sized companies.

9

25.    Robinson testified on direct that § 2.1.2(d) was intended to refer to what *advertisers* pay. However, the documentary evidence shown to him on cross-examination and admitted into evidence showed that Robinson knew that the CPM for Basic Video Media (*i.e.*, video *not* using Panache technology) would be based, not on what advertisers pay, but on an implied ad-serving fee.

    a.  On October 14, 2011, Spence stated to Robinson:

> All media revenues that directly leverage Panache Ad Unit technology and that are not already accounted for through tech revenues (eg Ad serving) will be credited at Gross Profit (Billings less Publisher rev share+3rd Party Costs) [sic]. Practically, this means that a video impression served on our media network and utilizing a proprietary Panache ad format will be recognized at GP; video impressions served on the media network not utilizing a Panache ad unit will be credited a tech serving fee. *See* D. Ex. L. *See also* P. Ex. 50.

    b.  Robinson confirmed to Daniel Chen of Panache on October 14, 2011:

> [T]his means we get credit for ad revenues related to all video ad serving using Panache technology. If it is a Panache premium ad unit it is rich format fees. If it is standard advertising, this means ad serving. This is what I want. *See* D. Ex. N.

    c.  Chen confirmed to Robinson:

> Yeah that's how I read it as well ... it [sic] not utilizing a panache product, then's it's [sic] just an ad serving fee (since it's their product, or a homegrown product by publisher or some other 3rd party). *Id.*

    d.  In an email dated October 1, 2011, Robinson advised McGuire, representing Panache's investors, in planning to propose a "standard" CPM to deal with the problem of 24/7 giving away Panache software, that the standard fee should be based on "video ad serving rates of 24/7's competitors in the video ad serving

10

business." *See* P. Ex. 88. Robinson quantified the video ad serving rates as $.20–$.25 CPM. *Id.* at slide 17.

e. On October 2, 2011, Robinson advised Chen of his anticipated BVMF: "So let's say 250 million standard ad views at $.20 = $50k / month through GWA only." *See* D. Ex. L-13. This projection, at 3 billion impressions a year and at a CPM of 20 cents, equals $600,000 of BVMF.

f. Projections sent to Panache by 24/7 on November 1, 2011, described the CPM for Basic Video Media as "Internal Adserving CPM." *See* P. Ex. 9.

g. On January 23, 2012, Robinson estimated the "Publisher OAS Ad Serving Pricing" to be in the range of $.05–$.07 cents CPM. *See* D. Ex. O-4.

### *Documents Relating to the Negotiations of 2.1.2(d) Language*

26.   On November 1, 2011, to quantify 24/7's internal charge for ad-serving to the GWA, Spence proposed the following language for § 2.1.2(d): "on a CPM basis, which shall be 25% of the average CPM for video ad serving earned under third-party agreements etc." *See* D. Ex. V. Robinson, complaining about the discount to internal clients, stated in an email to McGuire later that day: "is this discount SOP [standard operating procedure] or are they just sticking it to us? They told me that they charge their internal companies 25% of the external enterprise rate. So they need to provide language that the discount off published rates for internal customers is the same as for other products and services." *See* D. Ex. X.

27.   The next day, on November 2, Robinson proposed a modification: "on a CPM basis, which shall be no lower than the actual fees charged for Basic Video Media or 25% of the average CPM for video ad serving earned under third-party agreements etc." *See* D. Ex. M-13.

In a cover email, Robinson explained: "Item(d): Charging internal customers, easy to follow in markup." *Id.*

    a. Robinson, with this proposed "actual fees" language, sought to capture the fees associated with the GWA's use of ad-serving technology.

    b. Robinson testified at trial, however, that his proposed language was intended to capture the fees charged to *advertisers*.

        i. Robinson's testimony, stating what he would like his earlier written statement to mean, is not relevant and not credible.[4] Robinson's proposal sought credit, not for fees 24/7 charged to advertisers, but for "actual fees" 24/7 charged for ad-serving technology, as applied to the Global Web Alliance, an "internal customer." This was equivalent to the book-keeping charge for the GWA, capturing an implied charge for the use of technology in connection with the aggregation of small publishers by 24/7 to form the GWA. Robinson's email acknowledges that the fees regarded "charging internal customers." Robinson did not mention fees to advertisers.

28. Documentary evidence further shows that Robinson did not intend that his November 2 proposed "actual fees" language should refer to advertisers' CPM, and that Robinson was instead referring to an "internal" charge for ad-serving.

    a. On November 4, Robinson stated in his notes of a phone conversation with Spence: "They will work on language that assures us they won't internally offer

---

[4] "The best evidence of what the parties intended is what they say in their writing," *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Greenfield v. Philles Records, Inc.*, 750 N.Y.S.2d 565 (2002)).

12

our such services to internal groups at rates that are lower than what 24/7 typically provides (this might be the right language)." *See* D. Ex. W.

b. On November 11, Robinson emailed Schneider: "For item (d) Sheila said consistent practices as you do for display and it is just a matter of coming up internally to document practices." *See* D. Ex. G-13.

c. On November 13, Robinson proposed: "rates charged to internal groups shall be no lower than the rate charged for similar services or 25% of the average CPM for video ad serving." *See* P. Ex. 96.

d. On November 15, Robinson emailed McGuire and acknowledged that he was waiting for language to price the internal clients: "We still haven't seen the earn-out language . . . to ensure our technology is provided at pricing to internal clients consistent with their practices." *See* D. Ex. B-2.

29. On November 18, Spence proposed what would ultimately become the final version of § 2.1.2(d). *See* P. Ex. 23; D. Ex. H-2.

a. Spence's provision for § 2.1.2(d) proposed "the applicable CPM derived using the same methodology used by 24/7 Group to derive the internal CPM charged to the Global Web Alliance for display serving as applied to video serving."

b. Spence's email of November 23 advised Robinson that the clause was "responsive to [Robinson's] request," *see* P. Ex. 16, that Panache be credited for the "actual" fees charged to the GWA for ad-serving, consistent with 24/7's internal practices.

30. I find that at the date of agreement Robinson did not expect that BVMF would be based on CPM relating to charges to, or revenue received from, advertisers.

13

*The Meaning of §2.1.2(d)'s "Methodology" and "Internal CPM"*

31. § 2.1.2(d) refers to a "methodology" used to determine the "internal CPM" charged to the GWA.

32. Schneider negotiated § 2.1.2(d) believing that a methodology existed and that it yielded something in the range of "pennies," but could not articulate the details of that methodology.

33. Schreiner, 24/7's controller, closed 24/7's books each month using a $.01 (1 cent) CPM internal charge to GWA revenue to recognize its use of ad-serving technology, *i.e.*, a charge to the media side by the tech side. *See* P. Ex. 323. Schreiner testified that the internal cross charge was historically $.01, and had not changed between 2011 and 2014.

34. After the earnout year ended, 24/7 informed Robinson on March 27, 2014, that, according to its methodology, the internal charge under § 2.1.2(d)(i) was $.01. *See* P. Ex. 67. On April 10, 2014, Robinson requested "backup information." *Id.*

35. Employees at 24/7 did not initially have a common understanding of the meaning of "methodology" referred to in § 2.1.2(d). *See* P. Ex. 33, 34.

   a. On March 28, 2014, Christina Van Tassell stated in an internal email to 24/7 colleagues: "confirmed with Debbie [Schreiner], we have no methodology." *See* P. Ex. 294; *see also* P. Ex. 64.

   b. On March 28, 2014, Paul Georges-Picot advised that, in 2011, 24/7 had used the methodology of dividing total operating costs by total impressions, resulting in a 1.17 cent CPM. *See* P. Ex. 33; D. Ex. N-2. The same methodology, costs/impressions, was used to calculate the CPM of Open Ad Stream for the

14

2012 year, resulting in a CPM between 0.69 and 0.86 cents. *See* D. Ex. V-3. Georges-Picot suggested that this methodology is the one referred to in § 2.1.2(d).

36. The costs/impressions methodology, as referred to § 2.1.2(d) and as applied by Defendants to calculate BVMF, does not distinguish operating costs between video ads and display ads. Schreiner testified that, since video and display ads use similar technology and costs, distinctions were impractical. *See also* P. Ex. 29, 331. Thus, *total* operating costs were divided by *total* impressions.

### *The Novemeber 1, 2011, Projections*

37. On November 1, 2011, Schneider gave projections to Panache, stating that the CPM for Basic Video Media[5] was $.0175 (1.75 cents). *See* P. Ex. 9.

   a. The $.0175 CPM was described as "25% of the average CPM for video ad serving experienced with 3rd party agreements with customers of the Publisher-Side Video Technology with similar volumes of impressions on an annual basis."

38. The projections contained an inconsistency, however. The projections estimated (under the "Medium Projection") 335.3 million annual video impressions in 2013 and an earnout credit of $587,000. These projections imply a CPM of $1.75 (1.75 dollars), which is inconsistent with the stated CPM of $.0175 (1.75 cents). The arithmetic leading to the implied $1.75 CPM is as follows: divide the projected earnout of $587,000 by the projected 335.3 thousand impressions[6], which yields $1.75 (1.75 dollars).[7]

---

[5] The projections referred to Basic Video Media as "Video Revenue w/o Ad Unit." Enhanced Video Media is referred to in the projections as "Video Revenue w/Ad unit."

[6] The 335.3 thousand number is the projected 335.3 million impressions divided by a 1000, since CPM is cost *per thousand* impressions.

[7] Put in the converse, the projected 335.3 million impressions times $1.75 CPM yields the projected $587,000 earnout credit. By contrast, the projected 335.3 million impressions times the stated $.0175 CPM would yield only $5,870.

15

39. I find, in light of all the evidence of the negotiations between Schneider and Robinson (as recounted in the previous paragraphs), that Robinson's testimony, that the calculation of BVMF was based on fees paid by advertisers, is not credible.

## CONCLUSIONS OF LAW

40. Under Count 1 of the Complaint, Plaintiff alleges breach of contract, specifically breach of APA § 2.1.2.[8]

41. Count II of the Complaint was dismissed before trial.[9]

42. "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The APA has a choice of law provision designating New York law. *See* § 10.2(a). New York law applies to this case. *See Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015).

43. "The essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc.*, 16 N.Y.S.3d 298, 299–300 (2nd Dept. 2015). The burden is on the plaintiff to show "by a preponderance of the credible evidence" that defendant breached its contractual duties. *See e.g., A. Montilli Plumbing & Heating Corp. v. Valentino*, 935 N.Y.S.2d 647, 649 (2nd Dept. 2011). "To create a binding contract, there must be

---

[8] Plaintiff withdrew during trial its claim that APA § 7.4 was also breached. *See* Transcript, Dec. 11, 2017, p. 335.
[9] Count II of the Complaint, alleging a fraud count that Defendant "knowingly and intentionally misrepresented" that Panache would be credited for all video ad impression revenue, was dismissed before trial. *See* Transcript, December 4, 2017, p. 53–54. The fraud count merely restates the breach of contract count. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (a fraud claim merely "restating what is, in substance, a claim for breach of contract"); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir.1996)); *WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66, 67 (2nd Dept. 2001) (misrepresentation of fact not "collateral to the contract"). The APA also contains an integration clause. *See* APA § 10.9; *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 284 (S.D.N.Y. 2017).

16

a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).

44. "It is axiomatic under New York law . . . that '[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties.'" *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quoting *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)). The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Tigue v. Commercial Life Ins. Co.*, 631 N.Y.S.2d 974, 975 (4th Dep't 1995)), which requires a court to "give full meaning and effect to all of [the contract's] provisions," *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir.2010) (internal quotation marks omitted) (quoting *Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st Dept. 1990)).

45. "However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *Id.*[10]

46. § 2.1.2(d) is an ambiguous provision that cannot be understood literally. Accordingly, extrinsic evidence, showing the reasonable understanding of the parties as to the meaning of §2.1.2(d), was heard at trial. *See* Transcript, December 11, 2017, p. 383.

---

[10] Neither party asked for reformation of the contract.

17

47. I hold that Defendant's interpretation of § 2.1.2(d) is correct, and that there was no breach of contract by Defendant.[11]

48. I hold that Defendant correctly applied the methodology referred to in § 2.1.2(d)(i), that the internal cross charge to the GWA was $.01, and that the CPM to be used in the earnout calculation under § 2.1.2(d)(i) is $.01. That internal charge yields $10,587 of revenue credit for BVMF.

49. I hold that Plaintiff's net revenue during the earnout year, reflecting the undisputed revenue amounts ($1,746,638) plus BVMF ($10,587) is $1,757,225. Multiplying this net revenue by two ($3,514,450), and deducting the $5 million threshold, *see* § 2.1.1(b), yields a negative number. Accordingly, Plaintiff is not entitled to any recovery.

50. In order for Panache to be entitled to any earnout payment, the BVMF component of net revenue would have to exceed $753,362[12] and, relatedly, the CPM would have to exceed $0.7116 (71.16 cents).[13] However, as I found, Panache has put forth no credible evidence that the CPM is anything other than the $0.01 CPM described in previous paragraphs.

## CONCLUSIONS

51. Judgement is granted to Defendant Xaxis US, LLC, f/k/a 24/7 Real Media US, Inc., dismissing the complaint of FPP, LLC, f/k/a Panther Panache, LLC, with costs to be taxed by the Clerk.

SO ORDERED.
Dated: March 14, 2018
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

---

[11] Defendant's affirmative defense that 24/7's performance is excused because Robinson breached his Employment Agreement by disclosing confidential information to third-parties is stricken. *See* APA § 2.3(a). The information, the CPM figures discussed in previous paragraphs, was not shown to be "confidential information," and Robinson had the right to disclose this information to Panache's investors.
[12] That is, adding $753,362 to the undisputed amount, $1,746,638, yields $2.5 million, which, multiplying by two and deducting the threshold amount of $5 million, yields zero.
[13] 1,058,760,000 impression times a CPM of $.7116 yields $753,362.